[No. F032745. Fifth Dist. Aug. 16, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
MARTHA ELENA HERRERA, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II and III.

## COUNSEL

Christine Vento, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, J. Robert Jibson and Raymond L. Brosterhous II, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**ARDAIZ, P. J.**—Appellant, Martha Elena Herrera, and her codefendant, Juanita Hernandez (also referred to as Juana Hernandez), were jointly charged with two counts of transporting or selling methamphetamine in violation of Health and Safety Code section 11379, subdivision (a) (counts 1 and 2), and one count of possessing methamphetamine for sale in violation of Health and Safety Code section 11378 (count 3). Appellant was individually charged with possession of cocaine and methamphetamine in violation of, respectively, Health and Safety Code sections 11350, subdivision (a) and 11377, subdivision (a) (counts 4 and 7). Appellant entered not guilty pleas to each of these offenses and proceeded to jury trial. Her codefendant elected to enter guilty pleas rather than proceed to trial.

On the date set for appellant's trial, counts 4 and 7 were dismissed on motion of the prosecutor. After a number of in limine motions were heard, the presentation of evidence began. Two days later, the jury found appellant guilty of the three remaining charges.

On February 18, 1999, appellant was denied probation and ordered imprisoned for the lower term of two years on count 1, the lower term of two years on count 2, and the lower term of one year four months on count 3. The latter two terms were ordered stayed pursuant to Penal Code section 654. The court did not expressly state all these terms were to run concurrent to one another but its intent for them to do so can be inferred from the minute order setting the total term of imprisonment at two years.

Notice of appeal was timely filed on February 19, 1999. We will affirm.

### FACTS

*The Prosecution Case-in-chief*

Bakersfield Police Officer Collier testified that he had been with the force for 11 years. For the past three years, he had been assigned to the Narcotics Task Force, whose primary function was to investigate street-level narcotics dealers. He had received more than 300 hours of training regarding the methods used to manufacture, transport, and sell various drugs. He had also been trained in dealers' methods of detection avoidance and learned to be ever cognizant of his surroundings and circumstances.

As a task force member, he worked undercover and would frequently make illicit drug purchases from various street dealers, including women. It

had been his experience that female drug dealers always have at least one partner with them for protection.

Around 5:00 p.m. on October 1, 1998, Officer Collier received information from an informant that a person named Juana was selling methamphetamine (commonly known as "crank") by using a pager number. So, the officer decided to call the pager number.

He received a return phone call from a woman who identified herself as Juana. Officer Collier told the woman he wished to purchase $40 of methamphetamine but could not do so until after he got off work one hour later. Juana told him that was no problem—he could just page her again and, when ready, go to her residence at 1721 Baker Street, apartment A (in Bakersfield) to make the purchase. The officer acknowledged that it was unusual for individuals who sell narcotics to give out their address.

Officer Collier then made arrangements with his task force team members to go to the area Juana mentioned. The officer photocopied and date-stamped two $20 bills he intended to use to purchase the drugs. Roughly one hour had passed by the time he and his team members left for the pay phone at the AM-PM on the 900 block of Fowler near Owens Street. A Jiffy Lube was located next door.

From that location, Officer Collier called the pager number and waited for a return call. About 10 minutes later, Juana returned his call. The officer identified himself as Mike and told her he was still interested in buying the $40 worth of crank. He was then asked about his location and whether anyone was with him. He told the woman that he was at the Arco on Flower Street with his "old lady." She then asked about the type of car he was driving. Once she learned he would be in a green Blazer, she told him she would be right there and hung up the phone.

Roughly five minutes later, a two-tone green Chevy S-10 Blazer pulled up next to him at the phone booth. It was nearing 7:00 p.m., which the officer said was probably a good two hours after sunset. While his immediate area was dark, it was not pitch black, as it received some light from the fairly well-lit Arco station roughly 60 feet away.

The passenger in the Blazer asked if he was Mike. He said yes and asked if she was Juana. The passenger replied that Juana had sent her but Officer Collier did not believe her. He believed she was Juana based on the fact that her voiced matched that of the person he spoke to on the phone who had identified herself as Juana.

Officer Collier got out of his car and asked the woman if she had the stuff. Looking through the open passenger window, he could see a small, clear plastic Ziplock-type baggie dangling in the cupped right palm of the female passenger. The baggie, about half the size of a package of Sweet'N Low and roughly one-quarter inch high, contained what was later confirmed to be a usable quantity of methamphetamine. Officer Collier said there was nothing between appellant and her passenger to prevent appellant from seeing the drugs in her passenger's hand. A fellow officer, who was watching from another vehicle roughly 10 feet away, could not see what was in Ms. Hernandez's hand, as it was rather small.

The driver, identified at trial as appellant, looked around as though nervous but also watched as the transaction was conducted without protesting it in any way. In fact, the officer did not recall appellant saying anything at all. Officer Collier thought the driver also appeared to be listening to the conversation, spoken in normal tones, he had with her passenger. When asked whether the radio was on at the time of the transaction, the officer replied, "No, I don't. I don't remember that it was."

Once the officer saw the drugs, he handed the passenger the two $20 bills. The instant the exchange was made, appellant began to accelerate out of the area.

Officer Collier yelled at them to stop. When they complied, he walked up to the car and asked the passenger if he could get anything from her later. She told him it was no problem; that he could just page her back.

Appellant then drove out of the area, unbeknownst to her, with officers tailing her. Officer Collier and his partner who had pretended to be his girlfriend during the buy, Officer Caldwell, drove to the Baker Street apartment roughly one city block away. The officers watched as appellant and her passenger exited the Blazer and went inside the apartment. Officer Collier could not recall whether the women used a key to gain entry.

Officer Collier and his other team members converged on the apartment and arrested appellant and Ms. Hernandez. The $40 Officer Collier had given Ms. Hernandez was retrieved from her person and booked into evidence. Officers also found a pager on her.

At trial, Officer Collier was asked if the officers obtained a residence address for Ms. Hernandez. He said she gave them an address on Pioneer Drive that was at least one and one-half miles, possibly more than two miles, and more than five minutes drive to the location of the buy. As such, he did not believe the two women had come from Ms. Hernandez's residence.

*The Defense Case*

Appellant took the stand in her own defense. She said she had only lived in the Baker Street apartment for roughly three months when Juanita showed up at her door "about 6:50, about 6:55" on October 30, 1998, looking for a ride. This was the first time that Juanita had been to her apartment. She had not been there an hour earlier that evening.

Appellant said she met Juanita Hernandez two years earlier in a bar but the two had not spoken since then. When asked if she knew how Juanita knew her address, appellant said that one of Juanita's friends lived in the same apartment complex.

Appellant agreed to give Juanita a ride but used a borrowed Chevy S-10 Blazer to do so since she did not own a car. She did not have to retrieve the keys as they were already in her apartment.

Ms. Hernandez first asked to be taken to some apartment one block away on Baker Street so that she could pick up her backpack. Appellant took her there but could not identify the apartment in any way other than to say it was across the street from a church.

Appellant had to use the restroom, so she went inside with Ms. Hernandez. When asked who was at the apartment, appellant said she had no idea. When asked essentially the same question a second time, appellant said she did not actually see the female that was present as the female was "on the stairs" and the restroom was downstairs.

As they were leaving, Ms. Hernandez asked to be taken to the Arco station on Flower Street so she could meet a friend. Appellant agreed to take her there without asking any questions.

Upon their arrival at that location, appellant rolled down her window a little bit because, in her part of town, she does not trust anyone. She denied looking around because she knew what was going on and was nervous as a result. She specifically denied looking for police officers.

She then turned on her rap music but only ran it through the car's driver's side speakers. She did not play it loud.

Meanwhile, she noticed that Ms. Hernandez was talking to a young man who was somehow connected to a vehicle parked by the phone. To her knowledge, that man was not Officer Collier. She did not see him that night.

She paid no attention to what Ms. Hernandez and the man were saying or doing. She said she could not hear from her right ear. She did not see anything in Ms. Hernandez's hand or an exchange of money take place. She said could not see because it was pretty dark in that area. She took off when Ms. Hernandez tapped her on her shoulders.

When asked whether she stopped the car after she began to leave the area, appellant simply replied that was what the officer said took place. She had no knowledge of the officer's coming to the car and asking to buy more drugs. She denied stopping the car a second time.

Appellant admitted previously possessing and using methamphetamine but denied selling drugs out of her apartment. When asked if she had an agreement with Ms. Hernandez to sell drugs, appellant replied that she "didn't even know."

Appellant said she did not have a phone in the apartment. Nor did she have a cellular phone at the time. Juanita did not have a cell phone with her when she visited that night. Nor did she make any calls while in appellant's presence.

## DISCUSSION

## I

## ADMISSION OF THE COCONSPIRATOR'S STATEMENT

*Background*

During the in limine proceedings, defense counsel asked the court to conduct an Evidence Code section 402 hearing to determine the admissibility of codefendant Hernandez's statement to Officer Collier that she was selling dope out of 1721 Baker Street, apartment A. Counsel advised the court that this address belonged to appellant.

The prosecutor clarified that the statement she sought to introduce was made when Ms. Hernandez and Officer Collier were deciding on a place to conduct the sale. She said the precise statement was Ms. Hernandez's telling the officer that he could buy dope later, as she sold it out of this house. The prosecutor also pointed out that, after the sale, the officers followed appellant and Ms. Hernandez back to this apartment and arrested them. She argued that the statement was simply additional evidence linking appellant to the crime.

Defense counsel then argued that before the statement would be admissible under the coconspirator hearsay exception, it would have to be shown

that a conspiracy existed and that the statement was made during the conspiracy rather than before or after it. If it was being offered as such a statement, defense counsel argued that Juana's identity was unknown since Ms. Hernandez had denied that they were one and the same person.

At this juncture, the prosecutor advised the court that she would not be offering it for the truth of the matter anyway. She intended to introduce it to explain why the officers went to the apartment.

The court pointed out that the jury would have difficulty differentiating between using this statement for this limited purpose as opposed for the truth of what was being said.

The prosecutor thought the jury would see from the evidence that the drug deal was not transacted at the apartment and offered to tell the jury that the statement was not being offered for the truth of what was said but merely to explain the officers' actions. She also argued that the jury ought to be aware of the entire conversation arranging the drug sale.

The court then ruled the statement that the drugs could be picked up at 1721 Baker Street, when being offered to show the officers' response, in actuality showed no response. As such, it found its prejudicial value outweighed its probative value and ordered the statement excluded under Evidence Code section 352.

The prosecutor immediately responded that, under *People v. Jourdain* (1980) 111 Cal.App.3d 396 [168 Cal.Rptr. 702] (*Jourdain*), a prearrest statement made in furtherance of a conspiracy should come in even if made by a coconspirator.

The court pointed out that, as of the day before, the prosecutor was not seeking to offer the statement for the truth of the matter asserted.

The prosecutor said she had also argued it was a "circumstance." She maintained that it went to the corpus delicti, did show a response, and showed that "it went to [appellant]." The prosecutor argued that "[t]hey didn't do it because of the phone call. They went through. He followed her. But it also is a circumstance that connects her. And it would show an intent and knowledge."

Defense counsel argued that, in order to use the statement, the People would have to show that it was made while the conspiracy was in existence. He believed the prosecutor's reasoning was rather circular in that she was

trying to establish the conspiracy's earlier existence based on something that happened later.

The court reviewed *Jourdain* as well as Evidence Code section 1223 before making the following remarks:

"THE COURT: Well, I am looking at section 1223 and they are talking about what's required in order to present evidence. So, that statement, one of them is that the defendant against whom the declaration is offered was in the agreement to sell drugs or would later participate.

"Certainly, participation is there by the presence of her in the automobile.

"The statement must be in furtherance of the agreement to sell drugs. And the inference is that you can pick them up at that location, so that the people there at that location were parties to the agreement.

"The first one is that the statement must have been made while the declarant of the statement was involved in the agreement to sell drugs."

The court's only question was whether the person with whom the declarant had the agreement had to be named and cited, as an example, a scenario whereby 10 people lived at the residence identified by the declarant.

In response to a question by the court, defense counsel said that appellant and her very young son, who was only four or five years of age, were the only residents of the 1721 Baker Street apartment.

With that established, the court apprised counsel that it believed the requirements of section 1223 had been met.

Defense counsel then argued that the declarant's identity had to be established. He did not believe that had been established by the officer's preliminary hearing testimony.

The prosecutor informed the court that she believed the officer would say he heard the same voice during both telephone calls and while conversing with Ms. Hernandez during the drug sale.

The court reiterated its belief that the requirements of Evidence Code section 1223 had been satisfied.

Defense counsel then complained that it had yet to be established that a conspiracy existed at the time the statement was made.

The following colloquy then took place:

"THE COURT: You can draw an inference that the statement would not have been made unless there were some arrangements for someone to be there.

"[DEFENSE COUNSEL] MR. QUICK: We have to remember that the transaction, interestingly, did not go down at 1221-A [*sic*]. The transaction was at the Jiffy Lube.

"THE COURT: I don't think the location . . . makes any difference.

"The question is whether the people at 1221 [*sic*] were a part of an agreement to sell narcotics and the place was changed, location was changed, and the, the defendant to whom the declaration, the defendant to whom the declaration is asserted was a participant in the, driving the automobile, I guess, at the different location.

"MR. QUICK: Well, I just note for the record my disagreement with that because its [*sic*] somewhat sort of a self, you are saying it's a self proven statement that when the person said it they were already in a conspiracy.

"THE COURT: Well, if I am going to sell drugs, and I am telling somebody where to go pick them up, I think it's a reasonable inference that arrangements have been made for pick up at that location.

"MR. QUICK: Except that something, the officer testified that that's something that's very rarely done. He is very surprised anybody would say where they were selling narcotics.

"THE COURT: Well, whether is rarely done or not, I think a reasonable inference is arrangements have been made that people at that home who live there—

"MR. QUICK: I submit it, Your Honor.

"THE COURT: I think whether a conspiracy exists there or not would be for a jury to decide with appropriate instruction.

"And if they don't feel, if they don't want to draw those inferences, why then they are going to be told to disregard the statement."

The court proposed to accomplish this goal by utilizing CALJIC No. 6.24—the instruction discussed in *Jourdain*. (*Jourdain, supra*, 111 Cal.App.3d at p. 403.) This instruction was, in fact, later read to the jury.

*Analysis*

█ Appellant contends the trial court committed reversible error when it allowed, over her objection, Officer Collier to testify that Juana Hernandez offered to conduct the methamphetamine sale at appellant's apartment. This error, as she sees it, is based on the lack of independent evidence to show, prima facie, that a conspiracy involving appellant existed at the time the statement was made. She also complains that the trial court abdicated its duty under Evidence Code section 403 by failing to ensure sufficient evidence that the conspiracy existed before allowing the issue to go to the jury.

Respondent is of the opinion that the statement was properly admitted since a prima facie case of conspiracy was established. Respondent points to the facts beginning with appellant's driving Juana Hernandez to the location of the sale and ending with the two women going into appellant's apartment together afterwards as evidence that a conspiracy existed between appellant and Juana Hernandez.

Respondent also argues that *People v. Jeffery* (1995) 37 Cal.App.4th 209, 215 [43 Cal.Rptr.2d 526], allows the conspiracy determination to be made in the context, and with the benefit, of reference to later events. Respondent then argues that appellant's fortuitous appearance as the wheelman in a convenience store drug sale that occurred within minutes of the two phone calls weighs heavily in favor of finding that the conspiracy existed at the time of those phone calls.

Respondent also argues under the right-conclusion, wrong-reason theory of appellate review, that *People v. Sanders* (1995) 11 Cal.4th 475, 518 [46 Cal.Rptr.2d 751, 905 P.2d 420], would allow the statement to be introduced under Evidence Code section 1250 for the nonhearsay purpose of establishing Hernandez's intention to enter into a conspiracy to sell drugs.

Finally, respondent argues that any error that may have occurred in admitting the statement was harmless given the facts of this case.

A. *Foundational Requirement for a Statement to Be Admissible as an Admission Under the Coconspirator Exception to the Hearsay Rule*

█ As all roads lead to Rome, all dicta leads to problems and it is not uncommon that many legal references lead to dicta. This case is an illustration. Appellant asserts that the prosecution was obligated to make a prima facie showing that a conspiracy between Hernandez and appellant was in effect at the time the statement by Hernandez was made in order for the

court to admit the statement under Evidence Code section 1223 against appellant. The question becomes "what is a prima facie case?"

Generally speaking, hearsay evidence is inadmissible. (Evid. Code, § 1200, subd. (b).) Evidence Code section 1223 provides an exception to the hearsay rule as to statements made during the existence of a conspiracy that are in furtherance of its objective. This statute has, at all relevant times, provided as follows:

"(a) The statement was made by the declarant while participating in a conspiracy to commit a crime . . . and in furtherance of the objective of that conspiracy;

"(b) The statement was made prior to or during the time that the party was participating in that conspiracy; and

"(c) The evidence is offered either after admission of evidence sufficient to sustain a finding of the facts specified in subdivision (a) and (b) or, in the court's discretion as to the order of proof, subject to the admission of such evidence."

An early case held that the conspiracy "need be proved only to the extent of establishing prima facie evidence of the fact. It need not be established by a preponderance of the evidence in a civil action nor beyond a reasonable doubt in a criminal action; the latter doctrine applies only to the issue of guilt. Any evidence received by virtue of this rule necessarily is received conditionally, for in the final analysis, the jury must first pass judgment on the question as to whether the asserted conspiracy has been proved. If proved to the satisfaction of the jury, the evidence of the acts or declarations of a conspirator, in such circumstances, may be considered." (*People v. Talbott* (1944) 65 Cal.App.2d 654, 663 [151 P.2d 317] (*Talbott*).)

Prior to the adoption of the California Evidence Code in 1966, the Supreme Court relied upon *Talbott* in holding that before evidence of a declaration by an alleged coconspirator is admissible against another coconspirator, the fact of the conspiracy must be proved with prima facie evidence. (*People v. Steccone* (1950) 36 Cal.2d 234, 238 [223 P.2d 17] (*Steccone*).) *Steccone* went on to determine whether there was sufficient circumstantial evidence to make the required prima facie showing. In *Steccone*, the court determined that there was a "chain of connecting circumstances" pointing to a collaboration sufficient to make out the prima facie case of conspiracy against appellants. (*Id.* at p. 239.)

*People v. Earnest* (1975) 53 Cal.App.3d 734 [126 Cal.Rptr. 107] relied upon *Steccone* for the proposition that the "foundational requirement may be

met without establishing a conspiracy beyond a reasonable doubt or even by a preponderance of the evidence; only prima facie evidence of the fact is required." (*People v. Earnest, supra*, 53 Cal.App.3d at p. 741.) This implies that prima facie evidence is arguably something less than a preponderance or evidence that could constitute a preponderance.

Sections 400 through 405 of the Evidence Code define the terms and set forth the procedures to be utilized where the admissibility of evidence is dependent upon the existence of a preliminary fact. As used in these sections, a " 'preliminary fact' means a fact upon the existence or nonexistence of which depends the admissibility or inadmissibility of evidence." (Evid. Code, § 400.) Additional provisions that are pertinent to this claim include Evidence Code sections 402 and 403. Evidence Code section 402 provides:

"(a) When the existence of a preliminary fact is disputed, its existence or nonexistence shall be determined as provided in this article.

"(b) The court may hear and determine the question of the admissibility of evidence out of the presence or hearing of the jury; but in a criminal action, the court shall hear and determine the question of the admissibility of a confession or admission of the defendant out of the presence and hearing of the jury if any party so requests.

"(c) A ruling on the admissibility of evidence implies whatever finding of fact is prerequisite thereto; a separate or formal finding is unnecessary unless required by statute."

Whereas Evidence Code section 403 states:

"(a) The proponent of the proffered evidence has the burden of producing evidence as to the existence of the preliminary fact, and the proffered evidence is inadmissible unless the court finds that there is evidence sufficient to sustain a finding of the existence of the preliminary fact, when:

"(1) The relevance of the proffered evidence depends on the existence of the preliminary fact; [¶] . . . [¶] (b) Subject to Section 702 [(personal knowledge of a witness)], the court may admit conditionally the proffered evidence under this section, subject to evidence of the preliminary fact being supplied later in the course of the trial.

"(c) If the court admits the proffered evidence under this section, the court:

"(1) May, and on request shall, instruct the jury to determine whether the preliminary fact exists and to disregard the proffered evidence unless the jury finds that the preliminary fact does exist.

"(2) Shall instruct the jury to disregard the proffered evidence if the court subsequently determines that a jury could not reasonably find that the preliminary fact exists."

■ Evidence Code section 403, subdivision (c) does not indicate by what standard of proof the jury must be satisfied of the existence of the preliminary fact. "Except as otherwise provided by law, the burden of proof requires proof by a preponderance of the evidence." (Evid. Code, § 115.) Therefore, the correct standard of proof for a preliminary fact under Evidence Code section 403 is evidence sufficient to support a finding by a preponderance of the evidence. (*People v. Marshall* (1996) 13 Cal.4th 799, 832-833 [55 Cal.Rptr.2d 347, 919 P.2d 1280]; *People v. Simon* (1986) 184 Cal.App.3d 125, 134 [228 Cal.Rptr. 855]; 1 Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar 3d ed. 1997) § 24.5, p. 382.) In other words that there be sufficient evidence to enable a reasonable jury to conclude that it is more probable that the fact exists than that it does not. (*People v. Simon, supra,* 184 Cal.App.3d at p. 132, citing *People v. Albertson* (1944) 23 Cal.2d 550, 581 [145 P.2d 7] (conc. opn. of Traynor, J.).)

In *Simon,* the court held that the function of the trial court is to determine whether the evidence of the preliminary fact is "sufficient to allow the jury to determine by a preponderance standard" that the preliminary fact exists. (*People v. Simon, supra,* 184 Cal.App.3d at p. 134.) In *Marshall,* the court held that "the trial court must determine whether the evidence is sufficient to permit the jury to find the preliminary fact true by a preponderance of the evidence [citations], even if the court personally would disagree [citations]." (*People v. Marshall, supra,* 13 Cal.4th at pp. 832-833.)

■ The existence of a conspiracy at the time the statement is made is the preliminary fact to the admissibility of the coconspirator's statement. Moreover, Evidence Code section 1223 clearly states that evidence of a coconspirator's statement is admissible if supported by the "admission of evidence sufficient to sustain a finding" that it was made by the declarant, while participating in the conspiracy, in furtherance of the objective of the conspiracy and made prior to or during the time that the party was participating in the conspiracy. (Evid. Code, § 1223, subd. (c).) In effect, it is a statutory application of the standard of Evidence Code section 403 to the foundational requirement of a conspiracy for the purposes of admission of a coconspirator's statement. Therefore, the proponent must offer evidence sufficient for the trier of fact to determine that the preliminary fact, the conspiracy, is more likely than not to have existed. In this case under these facts, this would mean evidence sufficient to conclude that a conspiracy between Hernandez and appellant existed at the time the statement was made (there being no basis to conclude there were any other coconspirators).

The statement that a declaration is admissible against a coconspirator without establishing the conspiracy "even by a preponderance of the evidence" for the purposes of Evidence Code section 1223 has often been repeated since *People v. Earnest, supra,* 53 Cal.App.3d 734. (See *People v. Longines* (1995) 34 Cal.App.4th 621, 626 [40 Cal.Rptr.2d 356]; *People v. Jeffery, supra,* 37 Cal.App.4th 209, 215; *People v. Olivencia* (1988) 204 Cal.App.3d 1391, 1402-1403 [251 Cal.Rptr. 880]; *People v. Lipinski* (1976) 65 Cal.App.3d 566, 575 [135 Cal.Rptr. 451].) Although these cases discuss the circumstantial evidence of their respective conspiracies in terms of a prima facie case, they generally do not discuss whether the circumstantial evidence is sufficient for the trier of fact, the jury, to sustain a finding of conspiracy. This is misleading because the prima facie showing of a conspiracy is in fact evidence sufficient to sustain a finding of fact of a conspiracy by a preponderance of the evidence. (Evid. Code, § 1223, subd. (c); *People v. Von Villas* (1992) 11 Cal.App.4th 175, 231 [15 Cal.Rptr.2d 112], citing 1 Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar 2d ed. 1982) § 3.5.)[1]

The question becomes whether there is sufficient evidence which, if believed by the jury, would support the finding of a conspiracy. "The court should exclude the proffered evidence only if the 'showing of preliminary facts is too weak to support a favorable determination by the jury'." (*People v. Lucas* (1995) 12 Cal.4th 415, 466 [48 Cal.Rptr.2d 525, 907 P.2d 373], citing 3 Witkin, Cal. Evidence (3d ed. 1986) Introduction of Evidence at Trial, § 1716, p. 1675; see Evid. Code, § 403, subd. (a); *People v. Simon, supra,* 184 Cal.App.3d at p. 131.) "The decision whether the foundational evidence is sufficiently substantial is a matter within the court's discretion." (*People v. Lucas, supra,* 12 Cal.4th at p. 466, citing *Alvarado v. Anderson* (1959) 175 Cal.App.2d 166, 178 [346 P.2d 73].)

"The trial court has the preliminary, but not the final, authority to determine the question of the existence of the preliminary fact. Unlike in other situations [citation], under Evidence Code section 403, '[t]he preliminary fact questions listed in subdivision (a) [of Evidence Code section 403] . . .

---

[1]In 1982, Bernard Jefferson pointed out that *Earnest* erroneously cited to *Steccone* for the statement that only prima facie evidence of the conspiracy is required for admissibility. "What *Earnest* should have cited was Evid C § 403. Since the existence of the conspiracy is the preliminary fact to admissibility of a co-conspirator's statements and the existence of such preliminary fact is a question of relevancy, under Evid C § 403, the evidence to establish the preliminary fact must simply be that which is sufficient to sustain a finding of its existence. But even more specifically, *Earnest* should have cited Evid C § 1223, which defines the exception for an admission of a co-conspirator and which expressly states in subsection (c) that the evidence to establish the conspiracy need only be sufficient to sustain a finding of such a fact." (1 Jefferson, Cal. Evidence Benchbook, *supra,* § 3.5, p. 195.)

are not finally decided by the judge because they have been traditionally regarded as jury questions. The questions involve the credibility of testimony or the probative value of evidence that is admitted on the ultimate issues. It is the jury's function to determine the effect and value of the evidence addressed to it. . . . [T]he judge's function on questions of this sort is merely to determine whether there is evidence sufficient to permit a jury to decide the question. The "question of admissibility . . . merges imperceptibly into the weight of the evidence, if admitted." ' " (*People v. Lucas, supra,* 12 Cal.4th at pp. 466-467, citing Legis. Com. com., 29B pt. 1 West's Ann. Evid. Code (1995 ed.) foll. § 403, p. 361.)

■ This must be distinguished from Evidence Code section 405, which applies to preliminary fact determinations not governed by section 403 or 404. It provides that: "When the existence of a preliminary fact is disputed, the court shall indicate which party has the burden of producing evidence and the burden of proof on the issue as implied by the rule of law under which the question arises. The court shall determine the existence or nonexistence of the preliminary fact and shall admit or exclude the proffered evidence as required by the rule of law under which the question arises." (Evid. Code, § 405, subd. (a).)

Evidence Code section 405 requires the court to determine the existence of the preliminary fact itself and admit or exclude the proffered evidence accordingly. The critical difference between the two statutes is that under Evidence Code section 403, the court makes a preliminary determination regarding sufficiency whereas under Evidence Code section 405, the court makes a final determination regarding existence of the preliminary fact. Therefore, under Evidence Code section 403, absent some evidentiary consideration other than sufficiency of the evidence, the proponent of the evidence is entitled to present the proffered evidence to the jury if he or she can provide the court with sufficient evidence from which a reasonable trier of fact could conclude that the preliminary fact is more likely than not true.

■ In order for a declaration to be admissible under the coconspirator exception to the hearsay rule, the proponent must proffer sufficient evidence to allow the trier of fact to determine that the conspiracy exists by a preponderance of the evidence. A prima facie showing of a conspiracy for the purposes of admissibility of a coconspirator's statement under Evidence Code section 1223 simply means that a reasonable jury could find it more likely than not that the conspiracy existed at the time the statement was made.

B.   *There Was Sufficient Evidence for the Jury to Determine That It Was More Likely Than Not That the Admitted Statement Was Made in Furtherance of a Conspiracy*

■   A conspiracy exists when one or more persons have the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act by one or more of the parties to such agreement in furtherance of the conspiracy. (Pen. Code, § 184; *People v. Morante* (1999) 20 Cal.4th 403, 416 [84 Cal.Rptr.2d 665, 975 P.2d 1071]; *People v. Swain* (1996) 12 Cal.4th 593, 600 [49 Cal.Rptr.2d 390, 909 P.2d 994]; *People v. Belmontes* (1988) 45 Cal.3d 744, 789 [248 Cal.Rptr. 126, 755 P.2d 310]; 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Elements of Crime, § 156, p. 174.) These facts may be established through the use of circumstantial evidence. (*People v. Longines, supra,* 34 Cal.App.4th 621, 626; *People v. Towery* (1985) 174 Cal.App.3d 1114, 1131 [220 Cal.Rptr. 475].) They may also " 'be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy. [Citations.]' " (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1135 [36 Cal.Rptr.2d 235, 885 P.2d 1], quoting *People v. Cooks* (1983) 141 Cal.App.3d 224, 311 [190 Cal.Rptr. 211].)

■   Once the existence of the conspiracy has been independently established, the offering party must then make three additional showings in order for the content of the coconspirator's statement to be considered by the trier of fact. That party must show: (1) that the declarant (who may or may not be the defendant) was participating in a conspiracy at the time of the declaration; (2) that the declaration was made in furtherance of the objective of the conspiracy; and (3) that at the time of the declaration the party against whom the evidence is offered was participating, or would later participate, in the conspiracy. (*People v. Sanders, supra,* 11 Cal.4th at p. 516; *People v. Hardy* (1992) 2 Cal.4th 86, 139 [5 Cal.Rptr.2d 796, 825 P.2d 781]; accord, Evid. Code, § 1223.)

The acts and declarations constituting the conspiracy agreement itself are admissible as "part of a transaction" which is in issue and are, therefore, outside the hearsay rule. (*Jourdain, supra,* 111 Cal.App.3d at p. 405; *People v. Curtis* (1951) 106 Cal.App.2d 321, 326 [235 P.2d 51]; 1 Witkin, Cal. Evidence, *supra,* The Hearsay Rule, § 679, p. 664.)

■   In the instant case, there was sufficient evidence which, if believed by the jury, would support a finding that it was more likely than not that the appellant and declarant were in a conspiracy at the time the statement was

made. The call to Hernandez was made approximately one city block away from the Baker Street apartment. Hernandez and appellant arrived within five minutes after the phone call. Appellant watched the transaction take place without protest. Appellant appeared nervous and accelerated immediately after the transaction. Finally, Hernandez and appellant returned to appellant's Baker Street apartment after the transaction. All of this evidence is separate and apart from Ms. Hernandez's statement itself. Certainly it is not "too weak to support" a finding by the jury that the conspiracy existed at the time Ms. Hernandez stated that she was selling drugs out of appellant's apartment.

California courts require that the existence of the conspiracy be established by evidence independent of the proffered declaration.[2] (*People v. Leach* (1975) 15 Cal.3d 419, 430 [124 Cal.Rptr. 752, 541 P.2d 296]; *People v. Hardy, supra,* 2 Cal.4th 86.) Appellant argues that the colloquy set forth in the present case indicates that the trial court considered the proffered declaration in making its preliminary determination. It is ambiguous whether the trial court used the declaration at issue in determining there was sufficient evidence of the conspiracy. If it did so, it would be error. However, under the circumstances of this case, it would be harmless error.

On appeal, we review the action of the lower court, not its reasons. (*Davey v. Southern Pacific Co.* (1897) 116 Cal. 325, 329 [48 P. 117].) If a ruling is correct on any theory sustainable under the record, it must be affirmed regardless of the considerations, which may have moved the trial court to its decision. (*Ibid.*) Sufficient independent evidence of the conspiracy was established as above. Therefore, the trial court was obligated to find an adequate foundation. Whether the trial court did or did not consider the statement itself in making the preliminary fact determination would not have changed the result here given the trial court's legal responsibility under Evidence Code section 403. After the existence of the conspiracy is established by sufficient prima facie evidence, the content of the statement itself "must be considered in determining whether the declaration was in furtherance of what is established prima facie by independent evidence to have been the object of the conspiracy." (*People v. Leach, supra,* 15 Cal.3d at p. 431, fn. 10.)

Moreover, the jury was instructed, in general terms via CALJIC No. 6.24, that it was not to consider the statement of a coconspirator unless it found,

---

[2]The United States Supreme Court has held that this is not a requirement. (*Bourjaily v. United States* (1987) 483 U.S. 171, 181 [107 S.Ct. 2775, 2778, 97 L.Ed.2d 144].) "[A] court, in making a preliminary factual determination under [the coconspirator hearsay exception], may examine the hearsay statements sought to be admitted. As we have held in other cases concerning admissibility determinations, 'the judge should receive the evidence and give it such weight as his judgment and experience counsel.' " (*Ibid.,* quoting *United States v. Matlock* (1974) 415 U.S. 164, 175 [94 S.Ct. 988, 995, 39 L.Ed.2d 242].)

independent of the statement, that a conspiracy existed at the time the statement was made. Through the use of CALJIC No. 6.10.5, it was also told that, in order for a conspiracy to exist, there must be, among other things, two or more persons with the specific intent to agree to commit the crimes charged in counts 1 through 3 and the additional specific intent to commit those crimes.

If the above evidence was believed by the jury, a reasonable conclusion is that it is more likely than not that the statement regarding the Baker Street apartment was made while Hernandez was participating in the crime of possessing methamphetamine for sale, was made in furtherance of this crime, and made during the time appellant was participating in the crime by agreeing with Hernandez to possess methamphetamine for sale and with the intent to commit this offense. Furthermore, we believe the evidence would support such a determination by the trier of fact.

## II, III*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed.

Wiseman, J., and Moran, J.,† concurred.

Appellant's petition for review by the Supreme Court was denied November 29, 2000. Kennard, J., was of the opinion that the peition should be granted.

---

*See footnote, *ante*, page 46.

†Judge of the Tulare Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.