Filed 8/18/25  P. v. McCray CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JOSHUA MAURICE McCRAY,<br><br>Defendant and Appellant. | C100144<br><br>(Super. Ct. No. 19FE017054) |

A jury found defendant Joshua Maurice McCray guilty of numerous counts of robbery and burglary and other offenses.  At trial, the People introduced text message communications among defendant and his codefendants.  Defendant now argues the trial court erred in failing to instruct with CALCRIM No. 418 that would have required the jury to find the existence of a conspiracy before it could consider these text messages.  This claim is without merit.  We affirm.

1

## FACTUAL AND PROCEDURAL BACKGROUND

In a consolidated information, the People charged defendant with two counts of first degree robbery (Pen. Code,[1] § 211; counts one and three), eight counts of first degree residential burglary (§ 459; counts two, four, seven, nine, eleven, thirteen, nineteen, and twenty-five), unlawful possession of a firearm (§ 29800, subd. (a)(1); count five), attempted first degree robbery (§§ 211, 664; count six), and assault with a deadly weapon (§ 245, subd. (a)(1); count eight). The People alleged numerous aggravating circumstances, and that defendant suffered three prior strike convictions. The People also alleged that: (1) defendant personally used a firearm (§ 12022.53, subd. (b)) as to count three; (2) the offense in count three was committed by persons who voluntarily acted in concert and entered a specified inhabited structure (§ 213, subd. (a)(1)(A)); (3) defendant was armed with a firearm (§ 12022, subd. (a)(1)) as to count four; and (4) another person, other than an accomplice, was present in the residence during the commission of the burglary (§ 667.5, subd. (c)(21)) as to counts two, four, seven, and thirteen.

The fourth amended information also charged five codefendants: Isaiah Leo Garone, Timothy Leo Garone, Stephan Blain Gee, Anthony Jose Mosqueda, and Jose C. Smith. Autumn Michelle King had been charged as a codefendant in an earlier consolidated complaint. When defendant's case proceeded to trial, all codefendants had either pled guilty or were convicted in separate trials.

The People ultimately dismissed count eight and the firearm allegation on count four. Defendant waived his right to a jury trial on the prior strike convictions and three of the alleged aggravating circumstances.

---

[1] Undesignated statutory references are to the Penal Code.

*Motion in Limine Regarding Text Message Communications Among Defendant and Codefendants*

Before trial, the prosecutor moved in limine to use "PowerPoint presentations to present summaries of the raw data collected from the downloads of the defendants' phones," including text messages sent among the defendants relating to each of the offenses. The People said that "[i]n terms of any statements made in any text messages or other written communications, all of the statements offered for the truth are either made by the Defendant McCray or are Declarations Against Interest under Evidence Code section 1230. Therefore, all the text message communications and other statements contained in these exhibits are admissible and should be received in their entirety." At the May 15, 2023 pretrial conference, defendant objected to the way this data would be summarized and as to foundation for the data. The trial court ruled that the summaries of the cellphone data were admissible.

*Trial Evidence*

In opening argument, the prosecutor once referred to defendant and his codefendants as "co-conspirators." During its case-in-chief, the prosecution introduced the text message communications among Smith, Isaiah, Timothy, King, Gee, and defendant. Defendant raised no hearsay objection to these text messages. Evidence was also introduced that Timothy was Isaiah's father and that King was Smith's girlfriend or wife.

A detective testified that during the investigation defendant asked to speak with him because defendant "had some information about some burglaries and robberies" and "wanted some sort of agreement with the district attorney's office." Defendant told the interviewing detectives, "I'll tell you one name I'm associated with" and named "Jose Smith." Defendant provided identifying information for this person that was consistent with codefendant Smith. Defendant said, "we kinda know the same people. But like I said man, that's just one name right there" before later adding that Smith was "good for"

at least five home invasions. Defendant described Smith as "the head player" but then indicated "I'm not sayin' I haven't or anything with, you know what I mean?"

Defendant then said, "[t]here's one guy above him. [¶] . . . [¶] . . . I mean, it's, uh, t- two guys, one's a dad and the other one's his son." Defendant named the father as "Tim." Tim and his son were the "mastermind[s]" of the operation. They would give Smith "all the licks." The detective testified that a "lick" is a street term for "an easy way to come up on money," such as a robbery or a burglary. According to defendant, Tim and his son would tell Smith this "guy's got this, this, this there, or this, this, this," and "let's- go watch it and get the- you know, uh, the run down of the place."

Detectives then asked if defendant knew Smith's wife. He responded that he knew "Autti King," before adding "what's real funny is this bitch acts like, she ain't – she ain't part of nothin'." Defendant identified a picture of codefendant King during the interview. Detectives asked if King talked to "that Tim guy"; defendant answered yes. Detectives asked if defendant knew "some of the other players that, uh, Jose enlists in doin' dirt?" Defendant then named "Stephan Q" and provided identifying information for him. That information was consistent with codefendant Gee and defendant identified a picture of codefendant Gee as "Stephan Q" during the interrogation.

Later in the interview, defendant said "Imma tell you every lick we did, or whatever thing, you know what I mean," including "whatever I was involved." Detectives asked if defendant had any blood on his hands. Defendant responded, "nobody got killed man, but somebody got injured."

The People introduced cellphone location data at trial. This data showed that for some of the offenses, defendant was near the victim's residence and near some of his codefendants around or at the time of the offense. For example, for the robbery that occurred on January 1, 2019, defendant, Smith, and Isaiah were all near the victim's apartment at the time of the robbery. The People also introduced evidence that defendant's DNA was found on items left behind by the offenders at two of the crime

4

scenes.  In one of those cases, the victim testified that multiple people had broken into his home.

*Request for Jury Instruction CALCRIM No. 418*

At the May 15, 2023 pretrial conference, the trial court asked the prosecutor to provide jury instructions "by the time the jury is selected."  Given that jury selection was to begin the next day, the prosecutor explained he was "not going to be able to do that within that time frame" and asked to have until May 19.  Defense counsel interjected, "Judge, if you asked me to do it, I would have gotten it done."  The court permitted the prosecutor to provide jury instructions by May 19.  The court explained, "[t]he reason why it's so important to have jury instructions up front is because they are often argued about, and we only have so much time during breaks and at lunch and after the jury leaves to talk about them."  The court then asked defense counsel if there were any jury instructions he would like.  Defense counsel responded, "I can have those for the Court whenever it wants."  The court requested them by May 19.

On May 24, 2023, the trial court indicated it had reviewed the proposed jury instructions.  The court asked defense counsel if he wanted anything inserted.  The following exchange took place:

"[Defense counsel]:  I'm not in a position to finalize jury instructions yet, so --

"THE COURT:  Okay.

"[Defense counsel]:  -- if that's what we are doing in this five minutes, I'm objecting.

"THE COURT:  All right.  Your objection is noted for the record, Counsel.  I'm not going to allow you to submit instructions at the last minute, to delay the trial.

"[Defense counsel]:  Your Honor, if the Court is not going to let me object, not submit jury instructions, the Court doesn't need me in here, really.

"THE COURT:  Counsel, I need you to do your -- fulfill your responsibilities.  Okay?

5

"[Defense counsel]:  You know what, this Court -- this Court is subjecting time constraints on my case.

"THE COURT:  All right.

"[Defense counsel]:  I've been very cooperative, but there's a point, too, where I am going to submit my instructions.  If the Court doesn't want to take them, I'll put them on demand and object."

On May 25, 2023, immediately before the prosecutor rested his case and delivered his summation, defense counsel requested several jury instructions be given, including CALCRIM No. 418, entitled "Coconspirator's Statements."  The following exchange took place:

"[Defense counsel]:  I think there's been a lot of evidence about co-conspirators, not only with their phones, but with the text messages.  And without some instruction to the jury as to how to deal with that, which is what these go to – it's some protection for the Defendant. . . .

"THE COURT:  All right.  I'm going to have to take a break and do some research.  Do you have any case law that supports your position, Counsel?

"[Prosecutor]:  No, because this is being brought up at the last second.  This is a complex legal issue.

"[Defense counsel]:  Oh, come on now.

"[Prosecutor]:  I would have looked at this if I had any indication.

"THE COURT:  That's why I asked if the Defense has any requests early, so we could get this done.

"[¶] . . . [¶]

"[Prosecutor]:  This also is inapplicable.  All of the statements in this case came in under a theory of statements against penal interest, and this is a complex legal issue that I'm not prepared to address in the closing I'm about to give."

Following a break, the prosecutor further argued about the request for CALCRIM No. 418 stating, "I did not admit any statements in this case under Evidence Code section 1223, so I don't believe it's applicable." The trial court concurred and denied the request for the instruction. After defense counsel objected but could offer no case authority to support his position, the court stated it "finds that not only is [the request] untimely, but unsupported by case authority."

The trial court instructed the jury that defendant may be found guilty of a given offense as a direct perpetrator or an aider and abettor. The jury found defendant not guilty of count nine and guilty on all remaining counts. The jury also found true the firearm allegation, all of the section 667.5, subdivision (c)(21) allegations, and some of the aggravating circumstances presented to them. In a bifurcated bench trial, the court found true defendant's prior strike convictions and the remaining alleged aggravating circumstances. The court sentenced defendant to an aggregate term of 177 years to life plus 16 years of imprisonment.

Defendant timely appealed.

DISCUSSION

Defendant argues the trial court erred in failing to instruct the jury with CALCRIM No. 418 and that this error prejudiced him.

CALCRIM No. 418 states:

"In deciding whether the People have proved that (the defendant[s]/Defendant[s] _____<insert name[s] of defendant[s] if codefendant trial and this instruction does not apply to all defendants; see Bench Notes>) committed [any of] the crime[s] charged, you may not consider any statement made out of court by _____<insert name[s] of coconspirator[s]> unless the People have proved by a preponderance of the evidence that:

"1. Some evidence other than the statement itself establishes that a conspiracy to commit a crime existed when the statement was made;

7

"2. \_\_\_\_\_<insert name[s] of coconspirator[s]> (was/were) [a] member[s] of and participating in the conspiracy when (he/she/they) made the statement;

"3. \_\_\_\_\_<insert name[s] of coconspirator[s]> made the statement in order to further the goal of the conspiracy;

"AND

"4. The statement was made before or during the time that (the defendant[s]/Defendant[s] \_\_\_\_\_<insert name[s] of defendant[s] if codefendant trial and this instruction does not apply to all defendants>) (was/were) participating in the conspiracy."

The Bench Notes for CALCRIM No. 418 state: "It is an open question whether the court has a sua sponte duty to instruct on the use of a coconspirator's statement to incriminate a defendant. [Citations.] On request, the court must give this instruction if the statement has been admitted under Evidence Code section 1223."

As an initial matter, we find compelling the trial court's decision to deny defendant's request as untimely and unsupported by case authority. Our Supreme Court confronted a similar set of facts in *People v. Ramos* (1997) 15 Cal.4th 1133. In that case, the trial court had set a schedule to review proposed jury instructions well in advance of summation. (*Id*. at pp. 1180-1181.) But "[i]mmediately prior to closing argument, defense counsel broached the subject for the first time" of instructing the jury not to consider the defendant's prior death verdict. (*Id*. at p. 1180.) The trial court " 'felt it was an untimely request and did not permit that to be done in view of the fact that we spent a lot of time getting instructions ready and both sides were ready to argue.' " (*Ibid*.) Our Supreme Court explained that, under section 1093.5, " 'all requests for instructions on points of law must be made to the court and all proposed instructions must be delivered to the court before commencement of argument. . . .' Delivery presupposes a written presentation to afford an intelligible basis and orderly manner for making these determinations." (*Ramos*, at pp. 1180-1181.) Our Supreme Court concluded that the

8

11th-hour request, "[b]eing untimely and not in proper form . . . was justifiably refused." (*Id*. at p. 1181.)

The present case is analogous to *Ramos*. The trial court here set a schedule at the May 15 pretrial conference for the parties to submit jury instructions. Defense counsel agreed to this schedule, and defense counsel knew at the time that the People would seek to admit the text messages as they were the subject of a motion in limine. Yet defense counsel did not request the jury be instructed with CALCRIM No. 418 until right before the prosecutor was to deliver his closing argument. Defense counsel made the request orally and provided no case authority to support his position.

If the trial court had no sua sponte duty to instruct with CALCRIM No. 418, we would affirm the ruling denying defendant's request on the basis that it was untimely and in improper form. But, as the Bench Notes for CALCRIM No. 418 indicate, it is presently an open question whether a trial court has a sua sponte duty to instruct with CALCRIM No. 418 in appropriate cases. If the trial court had such a duty that applied in this case, the fact that defendant's request was untimely would be irrelevant.

But here we do not need to address whether a trial court has a sua sponte duty to instruct with CALCRIM No. 418. This is because we conclude the trial court here properly denied the request on the merits and that, even assuming error, defendant was not prejudiced.

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. (*People v. Valencia* (2021) 11 Cal.5th 818, 831; Evid. Code, § 1200, subd. (a).) Hearsay evidence is generally inadmissible unless it falls under a recognized exception. (*Valencia*, at p. 831; Evid. Code, § 1200, subd. (b).) One exception, set forth in Evidence Code section 1223, is for hearsay statements by coconspirators. Such statements may " 'be admitted against a party if, at the threshold, the offering party presents "independent evidence to establish prima facie the existence of . . . [a] conspiracy." ' " (*People v. Thompson* (2016) 1 Cal.5th 1043, 1108.) "Pursuant to Evidence Code section 1223,

'[o]nce independent proof of a conspiracy has been shown, three preliminary facts must be established: "(1) that the declarant was participating in a conspiracy at the time of the declaration; (2) that the declaration was in furtherance of the objective of that conspiracy; and (3) that at the time of the declaration the party against whom the evidence is offered was participating or would later participate in the conspiracy." ' " (*Ibid*., fn. omitted.) "[T]he proponent must offer evidence sufficient for the trier of fact to determine that the preliminary fact, the conspiracy, is more likely than not to have existed." (*People v. Herrera* (2000) 83 Cal.App.4th 46, 61.)

CALCRIM No. 418 instructs the jury on the foundational requirements for the coconspirator exception under Evidence Code section 1223. It explains that, before the jury may consider out-of-court statements by coconspirators, the jury must find: (1) that "[s]ome evidence other than the statement[s]" establishes the conspiracy; and (2) the existence of the three preliminary facts detailed by Evidence Code section 1223.

But, as the People pointed out below, the text messages here were not admitted pursuant to Evidence Code section 1223. Defendant raised no hearsay objection to the text messages at trial, so the trial court never ruled on their admissibility pursuant to a specific hearsay exception. Even now, defendant does not contend the text messages would have been inadmissible but for the application of Evidence Code section 1223. The jury thus did not need to determine any foundational facts to support the coconspirator exception, as the exception was never invoked. Accordingly, the jury did not need to be instructed with CALCRIM No. 418.

In any event, even if the omission of the instruction was error, it did not prejudice defendant. Defendant insists the failure to instruct with CALCRIM No. 418 violated his federal constitutional rights and thus the judgment must be reversed unless the error was harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18. In his view, the omission of the instruction was "analogous" to the omission of an element of the offense. We disagree. Defendant was not charged with conspiracy, and

10

conspiracy is not an element of robbery, burglary, or any of the charged offenses. The jury was not instructed on derivative liability through an uncharged conspiracy under CALCRIM No. 416 and, despite one errant use of the word "co-conspirator" during opening argument, the prosecution did not attempt to prove derivative liability under a conspiracy theory. Rather, the jury was instructed only as to theories of direct liability and aiding and abetting liability.

The failure to instruct jurors regarding coconspirator statements is governed by the state law harmless error standard and is deemed harmless unless it is reasonably probable that a result more favorable to the defendant would have been achieved in the absence of the error. (*People v. Prieto* (2003) 30 Cal.4th 226, 251-252; *People v. Sully* (1991) 53 Cal.3d 1195, 1231; *People v. Watson* (1956) 46 Cal.2d 818, 836.) The defendant bears the burden of demonstrating prejudice under this standard. (*People v. Gonzalez* (2018) 5 Cal.5th 186, 201.)

Defendant fails to satisfy that burden here. Defendant argues there was insufficient independent evidence of a conspiracy to permit the jury to consider the text messages. We disagree. "A conspiracy exists when one or more persons have the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act by one or more of the parties to such agreement in furtherance of the conspiracy." (*People v. Herrera*, *supra*, 83 Cal.App.4th at p. 64.) "It is frequently necessary to infer the existence of a conspiracy through circumstantial evidence." (*Munoz v. Superior Court* (2020) 45 Cal.App.5th 774, 780.) Here, defendant's own statements in the interrogation implicated himself, as well as Smith, Timothy, Isaiah, Gee, and King, in orchestrating a series of robberies and home invasions. The existence of a conspiracy could readily be inferred from these statements. The cellphone location data placing defendant in the vicinity of some of the victims' homes and some of his codefendants around or at the time of the offenses further supports the finding of a conspiracy, as does

11

the DNA evidence linking defendant to two of the crime scenes.  Defendant characterizes his admissions during the interrogation as "cryptic," arguing he never expressly "admitted participating in the conspiracy."  We are unpersuaded.

Even if the trial court had instructed the jury on CALCRIM No. 418, it is reasonably probable the jury would have found the existence of a conspiracy, by a preponderance of the evidence, based on evidence independent of the text messages.  So the jury still would have been permitted to consider the text messages among defendant and his codefendants when considering the question of defendant's guilt.

## DISPOSITION

The judgment is affirmed.


                                                    /s/
                                                    MESIWALA, J.



We concur:



 /s/
EARL, P. J.



 /s/
KRAUSE, J.



12