Filed 8/5/24  P. v. Richardson CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>KAJUAN A. RICHARDSON,<br><br>Defendant and Appellant. | F085549<br><br>(Super. Ct. No. BF188992A)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Brian M. McNamara, Judge.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill and Jeffrey D. Firestone, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

A jury convicted Kajuan Richardson (appellant) of three counts of human trafficking of a minor (Pen. Code, § 236.1, subd. (c); counts 1-3),[1] pimping (§ 266h, subd. (a); count 4), being a felon in possession of a firearm (§ 29800, subd. (a)(1); count 5), misdemeanor possession of cannabis for sale (Health & Saf. Code, § 11359, subd. (b); count 6), and misdemeanor possession of child pornography (§ 311.11, subd. (a); count 7). As to counts 1 and 2, the jury found not true the allegation that the offenses involved force or fear. (§ 236.1, subd. (c)(2).)

Following trial, as to counts 1-3, the trial court found appellant was previously convicted of a human trafficking offense. (§ 236.4, subd. (c).) The court sentenced appellant to 27 years eight months in state prison.

On appeal, appellant contends his convictions on counts 2 and 4 were not supported by sufficient evidence. He also claims that the trial court should have excluded a video of appellant having sex with one of the juvenile victims pursuant to Evidence Code section 352, erred in admitting text and social media messages sent by one of the victims, and committed instructional error. We conclude the convictions were supported by substantial evidence, that no error occurred, and that any presumed error was harmless. We affirm.

## BACKGROUND

Over the course of several months, appellant orchestrated a human trafficking ring involving an adult and two minors. He induced C.W. (age 15), S.V. (age 17), and D.A. (age 20), to engage in commercial sex acts for his financial benefit. He also unsuccessfully attempted to persuade M.R.V. (age 17) to work for him as a prostitute.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

## I. Initial Investigation and Enforcement Stops.

In February 2022, Meghan Hylton-Reed, a detective with the special victims unit of the Kern County Sheriff's Office, met with a Kern High School District police officer regarding C.W. C.W. had not been attending school, and her social media accounts contained images suggesting she was using drugs and involved in commercial sex work. After this meeting, Hylton-Reed obtained a search warrant for C.W.'s social media accounts and began investigating appellant.

On February 10, 2022, sheriff's deputies conducted an enforcement stop on a car driven by appellant. S.V. and D.A. were passengers inside of the car. S.V. appeared to be under the influence of a depressant. Deputies learned she had been reported as a runaway and transported her to the Jamison Children's Center.[2]

Appellant was released after the traffic stop, but deputies continued to surveil him and track the location of his cell phone. On February 14, 2022, deputies conducted an enforcement stop on appellant's car in a fast food restaurant drive-through. D.A. and M.R.V. were passengers in the car. M.R.V. had been reported as a missing person from the Jamison Children's Center.

Appellant was arrested and his vehicle was impounded. Appellant had 11 suspected Percocet pills and over $1,000 in cash in his pants pocket. Inside of the vehicle, deputies located approximately five to 15 grams of cannabis, several containers of concentrated cannabis, edible cannabis products, hallucinogenic mushrooms, and other cannabis paraphernalia. There were also stickers and other indicia labeled "Herbal Drop." In the trunk of the vehicle, a deputy located writing on a piece of paper that was titled "The Oldest Profession Known to Man."

---

[2] The Jamison Children's Center is a temporary shelter care facility for children operated by the Kern County Human Services Department.

## II.    Human Trafficking of C.W. (Count 1).

C.W. testified at trial with a grant of use immunity.  She stated she did not want to testify but claimed she was not afraid to do so.  She described her childhood as "rough," and stated her parents are "junkies" who did not care about her.

C.W. learned about appellant from a friend at school.  Appellant was known to sell cannabis, pills, and nicotine to high school students through his "Herbal Drop" business on social media.  C.W. testified she messaged appellant to purchase cannabis, then began selling cannabis for him.  In October 2021, she started spending time with appellant and stopped attending school.  Around this time, C.W. became addicted to Percocet, but claimed appellant never provided it to her and tried to get her to stop using it.

About a month after C.W. started hanging out with appellant, she began doing commercial sex work.  She did sex work with S.V., who she described as her cousin.  C.W. testified sex work was not her idea, but it was something she decided to do.  She worked for two to three months and had several sex dates per day.  She did the sex work in motels.  She generally charged $150 for 30 minutes, and once made over $1,000 in one night.

According to C.W., appellant did not set up sex dates for her.  She testified appellant posted advertisements for her on the internet at her direction.  Appellant also created a social media account for C.W. that contained images of her in provocative clothing and displaying cash she had earned from sex dates.  C.W. testified appellant did not force her to do sex work, and he never threatened her or made her believe he might hurt her.  However, at one point, appellant showed her his gun.

C.W. testified appellant sometimes waited in his car outside of the motel room while she was doing sex dates to look after her.  He sometimes gave her rides to motels for sex dates.  She asked for his opinion about the rates she should charge, and he gave her rules to follow, such as using protection during sex dates.  She initially claimed she did not give any of the money that she made to appellant.  She later testified she did give

4.

him money she earned from the sex dates but could not recall how much or how often. She also admitted she sent a message to S.V. through social media stating that all the money she makes from sex dates goes to appellant. When asked why she sent that message to S.V., C.W. responded, "Not going to speak on that."

C.W. stopped doing sex work when she got together with a new boyfriend. She testified appellant did not get angry or threaten her when she decided to stop working. She cares for appellant and considers him a good friend. She denied ever having a sexual relationship with appellant. However, the People played a video recovered from appellant's phone that shows C.W. and appellant having sex. S.V. also testified she saw C.W. initiate sex with appellant.

Text and social media messages between C.W. and appellant were admitted into evidence. The messages included discussions regarding appellant setting up sex dates for C.W. and S.V., transportation to and from sex dates, recruiting other girls to work for appellant, hourly rates, appellant being upset over C.W. becoming pregnant, appellant having C.W.'s "love and loyalty," and C.W. asking appellant for Percocet and Xanax.

On March 17, 2022, a deputy interviewed C.W. while she was in the hospital. The interview was recorded and played for the jury. During the interview, C.W. stated appellant "takes all the money" she makes from commercial sex work. She stated she had to do sex work or appellant would get mad, and that he would yell at her if she did not bring him enough money. She repeatedly expressed concern that she would be a "snitch" for talking to law enforcement.

## III. Human Trafficking of M.R.V. (Count 2).

M.R.V. testified with a grant of use immunity. She met S.V. in February 2022 while she was staying at the Jamison Children's Center. She was addicted to Percocet and was going through a difficult time in her life.

M.R.V. and S.V. decided to run away from the Jamison Children's Center together. After they left, S.V. used M.R.V.'s cell phone to contact appellant to find a place to sleep that night. S.V. told M.R.V. that she made money by selling drugs with appellant.

A few days later, M.R.V. met with S.V. and D.A. at a motel room provided by appellant. S.V. and D.A. told M.R.V. she would be able to make money selling drugs and would be able to buy Percocet. After S.V. left the motel, D.A. told M.R.V. they make money for appellant's cannabis shop by engaging in prostitution. D.A. said a "client" was coming over for a sex date, and told M.R.V. she could hide in the restroom. M.R.V. said she was not comfortable with this, so D.A. texted appellant and cancelled the sex date. The next morning, D.A. told M.R.V. another client would be coming before they left the motel room. While D.A. was in the shower, M.R.V. heard a knock at the door, and D.A. said to look through the window and let the person in if it was a man. M.R.V. crawled into the bed and heard another knock but did not answer the door. M.R.V. lied to D.A. and told her no one was there.

Later that day, appellant came and picked up D.A. and M.R.V. from the motel and they stopped at a park. While in the car, appellant asked M.R.V. if she would be willing to "sell [her] body to make money with them." Appellant explained he would take photos of her and post an advertisement for people who wanted to pay for her. D.A. told M.R.V. that appellant "gives them half" of the money that they earn. She also stated appellant takes them out to buy clothes and have their nails done, and that they use some of the money they make to buy drugs.

M.R.V. declined appellant's offer, telling him she "didn't want to have intercourse with anyone." Appellant said he understood and "respected that." Appellant and D.A. then told M.R.V. that if she was not comfortable having intercourse, she could make money doing sex acts other than intercourse, such as oral copulation. At some point, they also discussed the possibility of M.R.V. selling nude photographs. Appellant said they would figure out later what M.R.V. could do so he could still get paid.

6.

M.R.V. testified she never expressly rejected the idea of performing other types of sex acts or taking nude photos because she was "playing along" in order to placate appellant and get out of the situation. Appellant never threatened M.R.V., but she was worried because D.A. had told her appellant was dangerous, had a gun, and did not tolerate mistakes. M.R.V. explained that "basically they said it themselves that he's a pimp," and she didn't know what appellant "was capable of."

While speaking to appellant and D.A., M.R.V. became nauseated and dizzy. She testified she had been smoking Percocet pills that S.V. and D.A. were giving her. She opened the car door and vomited. Afterward, appellant drove to a fast food restaurant. Appellant told her he would buy her food, take care of her, and provide her with whatever she needed. As they were going through the restaurant drive-through, the police stopped the car, arrested appellant, and detained M.R.V. and D.A.

## IV.    Human Trafficking of S.V. (Count 3).

S.V. testified with a grant of use immunity. She grew up with C.W. In October 2021, she learned that C.W. was doing commercial sex work in Los Angeles. C.W. encouraged S.V. to start doing sex work, and they began doing sex dates together in houses and motels in Bakersfield.

S.V. identified appellant in the courtroom, but testified she did not want to look at him because he traumatized her by selling her to other men for sex and forced her to give him the money that she made. She testified appellant posted advertisements for her on the internet and made her answer calls from men seeking sex dates with her. Appellant set the prices and sometimes drove her to and from the sex dates. He told her he would "watch over" her while she was doing sex dates. She did several sex dates per day.

Appellant gave S.V. rules to follow during the sex dates. She had to use protection and could not kiss on the lips. Appellant told her not to get pregnant or she will ruin her

body. He also told her how to dress for sex dates and for the advertisements he posted online.

S.V. testified she had to give appellant all the money she earned from sex work. After each sex date, she would collect money from the buyer, put it in her purse, then hand it over to appellant. Appellant controlled how she spent any money, and she was dependent on him for food and clothes. She felt like she was "stuck" with appellant because things were bad at her home, and she had nowhere else to go.

Appellant talked about S.V. and C.W. being "part of his team." He gave S.V. and C.W. a car to drive to and from sex dates. S.V. identified three other girls who did sex dates for appellant. One of those girls was D.A. Appellant also had S.V. create a social media account to recruit other girls to do sex dates for him.

S.V. testified appellant sold cannabis and Percocet through his "Herbal Drop" business that he advertised on social media. S.V. and C.W. delivered drugs to buyers. Appellant gave cannabis and Percocet to C.W. and S.V., sometimes to use before sex dates.

S.V. never did sex work before meeting appellant. She testified she did not want to do sex work, but C.W. told her she had to do it or appellant would "get mad." Appellant never threatened her, but she saw him with a gun, and she feared that if she did not do sex work, appellant would abuse her. During a law enforcement interview, S.V. stated she started doing sex work for the money, but she testified she made this statement because she was scared and did not want to get in trouble.

Text and social media messages between S.V. and appellant were admitted into evidence. Similar to C.W., the messages between S.V. and appellant included discussions regarding setting up sex dates, dates arriving and leaving, hourly rates, recruiting girls to work for appellant, and drug deliveries.

## V.    Pimping of D.A. (Count 4).

D.A. did not testify at trial.  An investigator with the Kern County District Attorney's Office testified she located D.A. in Albuquerque, New Mexico, but was unable to procure her attendance.

Investigators obtained and reviewed text messages and messages on social media between appellant and D.A.  On February 3, 2022, D.A. sent appellant a message stating she had just moved to town and was looking for drugs.  Appellant responded that he wanted her to work for him, stating, "[Y]ou can do a number of things.  Content for Snap with us.  Webcamming.  All depends.  My girls are actually escorts but they do content on the side."  Appellant also stated, "[Y]ou work under me you'll never have to pay for anything.  Free weed, [Percocets], clothes, nails, phone bills, jewelry, whatever."  D.A. replied, "I'm w it."  Hylton-Reed opined that appellant was attempting to manipulate her into believing that working for him as a prostitute would be a better life.

In subsequent exchanges, appellant and D.A. messaged about her engagement in commercial sex work.  On February 12, 2022, appellant stated, "I got you a rich date tomorrow.  [$]700 or [$]800 … please don't mess it up."  Appellant also stated, "[A]lso I just posted your ad and I'm doing the texting for you.  Please stay in communication with me."  In another message, appellant told D.A., "[L]et's work and see what we can get done before S.V. come back."

Later that day appellant messaged D.A. and asked her, "You good[?]"  D.A. responded, "[Y]es, just bored."  Appellant then stated, "I know.  This S is boring but when that money come in is when the fun starts."  D.A. replied, "I know.  I can't wait."

The next day, appellant continued to message D.A. about the "[$]800 date."  Appellant told D.A., "[H]e is going on his way.  You got to look good and you got—you got to look and smell good for this one" and "please be nice.  He is a cool dude.  If not, then he gonna want to see someone else."  Appellant then stated, "[H]e is there," and they communicated about where a car was parked at a motel.

Other messages between appellant and D.A. included discussions about sending people to D.A., arranging for motel rooms, and hourly rates for "in calls." In one message, D.A. commented that she paid $80 for a room but only received $60 for "service."

On February 9, 2022, S.V. texted appellant that D.A. told her that she "ain't going to do dates because she is tired." Appellant responded, "[H]ow the hell you suppose to work if she sleep," and "[s]he already messing up [the] program." S.V. testified appellant referred to working for him doing sex dates as "being part of the program."

## VI. Appellant's Prior Trafficking of M.A.

M.A. testified she was trafficked by appellant in 2017, when she was 15 years old. She was not an alleged victim in the information. Her testimony was admitted pursuant to Evidence Code section 1101, subdivision (b).

M.A. met appellant at a party in Orange County. She began conversing with him through social media, and he convinced her to engage in commercial sex work. M.A. testified she did commercial sex work because she thought appellant was her boyfriend. She ran away from home to be with appellant and started doing cocaine with him. She explained that she was young, easily manipulated, and "just wanted to hang out with him."

Appellant posted advertisements with photos of M.A. online. He coordinated the sex dates for her, set the prices, and gave her rules to follow. She did sex dates almost every day. At first, appellant allowed her to keep 40 percent of her earnings, but eventually he took all of the money.

## VII. Expert Testimony on Human Trafficking.

Hylton-Reed, the lead detective in appellant's case, also testified as the People's expert on human trafficking. She explained a trafficker's main purpose is to make money. To this end, the trafficker will impose a set of rules known as the "program," and

will exercise control of all aspects of his business and everything that his victims do. The trafficker will control all the money that is made and control the victims' access to necessities like food and shelter. If one of his victims does not follow the rules, there will be consequences, which may include violence.

Hylton-Reed testified it is common for traffickers to monitor their victims during sex dates and require the victims to communicate when a purchaser is arriving and leaving. This is so the trafficker can ensure the correct amount of money is paid, and to protect the victims from being harmed or robbed. Many traffickers carry weapons to protect themselves and their victims. Traffickers are protective of their victims and work to ensure they are not taken by other traffickers.

Hylton-Reed explained that traffickers often target juveniles or young women from broken homes or abusive homes. They manipulate their victims by leading them to believe the trafficker will help them make money and provide them with a better life. Many traffickers use the "boyfriend pimp" tactic, which is using romance and intimacy to manipulate their victims into engaging in commercial sex acts. The trafficker will shower the victim with compliments and luxury to get the victim to fall in love with them. This allows the trafficker to exercise control over the victim, demand loyalty and dedication, and ensure the victim continues to make money for him. Hylton-Reed opined it is more common for traffickers to use manipulation than violence to control their victims, especially with juveniles.

Hylton-Reed testified that having sex with victims may be part of the trafficker's grooming process. The trafficker will also use sex to teach the victims how to perform certain sex acts to ensure that the victim can perform what the trafficker advertises.

Hylton-Reed reviewed the writing titled "The Oldest Profession Known to Man" that was found in appellant's trunk during the February 14, 2022, traffic stop. She explained the writing sets forth "rules and terminology of human trafficking." The writing contained the statement that "[w]omen are your main source of prosperity.

11.

Feelings are not a part of your structure." Hylton-Reed testified this was significant because victims are the main source of profit for the trafficker. A trafficker is not supposed to have feelings toward the victims, because in human trafficking culture, they are viewed as property. The writing also stated that victims "need to be groomed into the best possible prospect," which Hylton-Reed explained refers to manipulating victims to obtain psychological control over them.

Hylton-Reed reviewed appellant's tattoos, which she noted contained several references to human trafficking. Appellant has a tattoo of "PGO" on his left hand, which stands for "pimping going on." He also has a tattoo of "AOB" which stands for "all on a bitch." According to Hylton-Reed, this is a common tattoo for human traffickers, and means that everything they have is from the victims who work for them. Additionally, appellant has a tattoo of the phrase "304s cash me out," that is also a reference to making money from human trafficking victims.

Hylton-Reed reviewed appellant's social media accounts, which she testified contained numerous messages related to human trafficking and grooming victims. Appellant's social media accounts and phone also contained a photo of C.W. topless, and photos of S.V. and C.W. in lingerie.

## VIII. Search of Appellant's Residence.

After appellant was arrested on February 14, 2022, deputies searched appellant's residence pursuant to a search warrant. In appellant's bedroom they located a .44-caliber revolver and a box of ammunition. The revolver appeared to be the same weapon appellant is seen holding in a video downloaded from his phone. The parties stipulated appellant had previously been convicted of a felony.

Officers also found in the bedroom 53 grams of cannabis, 15 containers of concentrated cannabis, cannabis edibles, a digital scale, a notebook labeled "Herbal Drop" listing an inventory of cannabis products, and a pay-owe sheet.

A deputy opined that the cannabis was possessed for purposes of sales.

## DISCUSSION

**I.     Appellant's Conviction for Trafficking M.R.V. (count 2) was Supported by Substantial Evidence.**

Appellant claims insufficient evidence supported his conviction for trafficking M.R.V. Appellant concedes that he asked M.R.V. whether she was interested in making money through commercial sex, but argues he did not "cause, induce, or persuade" her to engage in commercial sex. (§ 236.1, subd. (c).) We disagree. The record conclusively establishes that appellant attempted to persuade M.R.V. to work for him as a prostitute.

### A.     Standard of review.

"To determine the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the prosecution to determine whether it contains [substantial] evidence that is reasonable, credible and of solid value, from which a rational trier of fact could find that the elements of the crime were established beyond a reasonable doubt." (*People v. Tripp* (2007) 151 Cal.App.4th 951, 955.) We "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) "We need not be convinced of the defendant's guilt beyond a reasonable doubt; we merely ask whether ' "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' " (*People v. Tripp*, *supra*, at p. 955, italics omitted.)

### B.     Elements of human trafficking of a minor (§ 236.1, subd. (c)).

Section 236.1, subdivision (c), provides: "A person who causes, induces, persuades, or attempts to cause, induce, or persuade, a person who is a minor at the time of commission of the offense to engage in a commercial sex act, with the intent to effect or maintain a violation of [certain enumerated offenses] is guilty of human trafficking." As pertinent here, the enumerated offenses include pimping (§ 266h) and pandering (§ 266i). "Pimping is a crime committed when a defendant knows a person to be a

13.

prostitute and derives support or maintenance from the prostitute's earnings." (*People v. Guyton* (2018) 20 Cal.App.5th 499, 506; § 266h, subd. (a).) Pandering is conduct that "[b]y promises, threats, violence, or by any device or scheme, causes, induces, persuades, or encourages another person to become a prostitute." (§ 266i, subd. (a)(2).)

"Section 236.1 [subdivision] (c) is violated in two circumstances: when a person, acting with the requisite intent, (1) induces a minor to engage in a commercial sex act; or (2) attempts to induce a minor to engage in such an act. The statute codifies the crime of attempted human trafficking of a minor and punishes actual inducement and attempted inducement in the same way." (*People v. Moses* (2020) 10 Cal.5th 893, 902.) A violation of section 236.1, subdivision (c), does not require force or fear.

### C. Substantial evidence supported the jury's finding appellant attempted to "cause, induce, or persuade" M.R.V. to engage in commercial sex.

Appellant argues the record shows he only asked M.R.V. whether she was interested in working for him as a prostitute, and when she declined, he did not persist in his efforts. He contends this does not rise to the level of "cause, induce, or persuade" as required by section 236.1, subdivision (c).

We are not persuaded. M.R.V. testified appellant asked her if she was interested in engaging in commercial sex "to make money with them," and explained that he would take photos of her and post advertisements. This alone was sufficient to sustain the conviction. By asking M.R.V. if she was interested in working for him, he necessarily attempted to "cause, induce, or persuade" M.R.V. to engage in commercial sex acts. Even assuming, as appellant suggests, that he merely "broached the topic to determine interest," his obvious purpose was to recruit M.R.V. to work for him. If appellant was not attempting to cause, induce, or persuade M.R.V. to engage in commercial sex, what other reason could he have had for asking the question?

Regardless, appellant's conduct went beyond merely asking M.R.V. if she was interested. During the same conversation inside of appellant's car, D.A., who was

working for appellant as a prostitute, told M.R.V. appellant lets them keep half of their earnings, that he would pay for her clothes and nails, and that she would be able to buy drugs. When M.R.V. declined, appellant and D.A. persisted, suggesting that if M.R.V. did not want to engage in intercourse, she could still make money with them by doing other types of sex acts. By describing the benefits of working for appellant and suggesting alternatives to intercourse, appellant continued his effort to "cause, induce, or persuade" M.R.V. to engage in commercial sex.

Appellant argues that D.A., rather than appellant, was primarily responsible for persisting in the attempt to recruit M.R.V. We recognize that M.R.V. testified on cross-examination that D.A. talked more about the idea of doing sex dates than appellant. But D.A. made these statements inside of appellant's car, in appellant's presence, and during the same conversation in which appellant attempted to recruit M.R.V. The only reasonable interpretation of the evidence was that appellant and D.A. were working together to try to convince M.R.V. to engage in commercial sex acts for appellant's benefit.

In any event, M.R.V. was clear in her testimony that appellant asked her if she was interested in engaging in sex acts to make money and suggested that she could do alternative sex acts if she was uncomfortable having intercourse. This constituted clear evidence that appellant attempted to "cause, induce, or persuade" M.R.V. to engage in commercial sex acts. Accordingly, appellant's conviction on count 2 was supported by substantial evidence, and this claim lacks merit.

## II. Appellant's Conviction for Pimping D.A. (Count 4) was Supported by Substantial Evidence.

Appellant contends there was insufficient evidence to sustain his conviction for pimping D.A., alleging there was no evidence she successfully made money from prostitution and gave it to appellant. We reject this claim. Although D.A. did not testify

15.

at trial, the evidence was overwhelming that D.A. worked for appellant as a prostitute and gave her earnings to appellant.

### A. Elements of pimping (§ 266h).

The crime of pimping is committed by "deriving support from the earning of another's act of prostitution." (*People v. McNulty* (1988) 202 Cal.App.3d 624, 630, italics omitted.) The offense has two elements: (1) the defendant knew the person was a prostitute; and (2) the defendant derived support in whole or in part from the money or proceeds the person earned as a prostitute. (§ 266h, subd. (a); see CALCRIM No. 1150.) "[T]he amount of money which defendant receives from the prostitute is irrelevant for purposes of a pimping conviction." (*People v. Jackson* (1980) 114 Cal.App.3d 207, 210.)

### B. Substantial evidence supported the jury's finding appellant received money D.A. earned through prostitution.

The evidence that D.A. worked as a prostitute for appellant was overwhelming. S.V. testified D.A. worked for appellant and did sex dates. In a text message conversation with S.V., appellant complained about D.A. being too tired to do sex dates and "messing up [the] program." M.R.V. testified D.A. told her that she made money for appellant's cannabis shop by engaging in prostitution, and that she was scheduled to have a sex date that evening. Moreover, while encouraging M.R.V. to work for appellant, D.A. stated appellant lets them keep half of the money they earn from sex dates.

D.A.'s messages with appellant also demonstrated she worked for appellant as a prostitute. The messages showed appellant recruiting her to work for him. Later, appellant messaged D.A. about setting up dates, renting motel rooms, hourly rates, and earning money. In one instance, appellant told D.A. he set up an "[$]800" date and encouraged her to "look and smell good," and they communicated about the date parking outside of the motel.

Appellant argues that it would be impermissible speculation to infer that D.A. made money as a prostitute or turned any of that money over to appellant. But S.V.

testified D.A. was doing sex dates, D.A. told M.R.V. she worked as a prostitute, and the messages between D.A. and appellant made clear she was working for appellant. While there was no direct evidence of D.A. physically giving money to appellant, D.A. told M.R.V. she gives appellant her earnings.

In any event, the totality of the evidence, including appellant's statements, messages, writings, and tattoos, overwhelmingly demonstrated that appellant orchestrated his human trafficking operation to make money by inducing his victims to engage in commercial sex acts. Additionally, S.V. and C.W. testified that appellant took some or all of their earnings from sex dates. Given this evidence, the only reasonable conclusion is that D.A. also gave money she earned from prostitution to appellant. Therefore, the evidence conclusively established appellant derived support in whole or in part from the money or proceeds D.A. earned as a prostitute (§ 266h, subd. (a)), and appellant's conviction for pimping was supported by substantial evidence.

### III. The Trial Court did not Abuse its Discretion in Admitting D.A.'s Text and Social Media Messages. Any Presumed Error was Harmless.

Appellant contends the trial court erred by admitting D.A.'s text and social media messages at trial, which he claims were inadmissible hearsay. Appellant does not argue D.A.'s messages were testimonial, and thus, the Confrontation Clause was not implicated by their admission. (See *Crawford v. Washington* (2004) 541 U.S. 36, 68–69.) Instead, appellant contends the statements were hearsay without exception, and their admission violated his rights to due process and fundamental fairness at trial. We conclude the trial court did not abuse its discretion in admitting the statements, and any presumed error was harmless.

#### A. Respondent's procedural contentions.

As a threshold matter, respondent argues appellant's hearsay claims should be rejected because he failed to identify and cite in the record the specific statements he challenges on appeal. (See Cal. Rules of Court, rule 8.204(a)(1)(C); *People v. Smith*

(2015) 61 Cal.4th 18, 48.) Appellant responds that briefing of the claims was adequate because he identified and cited specific statements in issue in the statement of facts, even though he did not repeat those citations in the argument section. We conclude this was sufficient for purposes of California Rules of Court, rule 8.204(a)(1)(C). Of course, we limit our review to the text and social media messages of D.A. specifically identified by appellant.

We also reject respondent's argument that appellant forfeited the instant hearsay claims by failing to object below. During S.V.'s testimony, the trial court overruled defense counsel's hearsay objections to the admission of messages between S.V. and C.W., finding they were admissible under the coconspirator hearsay exception proffered by the People. (See Evid. Code, § 1223.) At a break in the proceedings, defense counsel argued that the statements were not admissible under the coconspirator hearsay exception because the victims in this case cannot be charged with trafficking or prostitution under California law. Defense counsel reiterated this objection, which he characterized as his "standing hearsay and foundation objection," when the People sought to admit social media and cell phone records containing D.A.'s messages with appellant. This was a timely and specific objection, sufficient to preserve the issue for appeal. (See Evid. Code, § 353; *People v. Partida* (2005) 37 Cal.4th 428, 433–434.)

**B.    Applicable principles of hearsay.**

Hearsay is "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) Hearsay is inadmissible unless subject to a hearsay exception. (Evid. Code, § 1200, subd. (b).)

Two exceptions to the hearsay rule are relevant here. First, a defendant's hearsay statements are admissible. (Evid. Code, § 1220; *People v. Horning* (2004) 34 Cal.4th 871, 898, fn. 5.) Second, hearsay is admissible if it falls within the coconspirator

exception to the hearsay rule. (Evid. Code, § 1223.) This exception permits the introduction of statements "made by the declarant while participating in a conspiracy to commit a crime … and in furtherance of the objective of that conspiracy" if "made prior to or during the time that the [defendant] was participating in that conspiracy." (*Id.*, subds. (a), (b); see *People v. Brown* (2017) 14 Cal.App.5th 320, 332 (*Brown*).)

An out-of-court statement may also be admissible "if offered for a nonhearsay purpose—that is, for something other than the truth of the matter asserted—and the nonhearsay purpose is relevant to an issue in dispute." (*People v. Davis* (2005) 36 Cal.4th 510, 535–536.)

### C. Standard of review.

"[A]n appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence, including one that turns on the hearsay nature of the evidence in question." (*People v. Waidla* (2000) 22 Cal.4th 690, 725; accord, *People v. Clark* (2016) 63 Cal.4th 522, 590; *People v. Jones* (2013) 57 Cal.4th 899, 956.)

"Under the abuse of discretion standard, 'a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Hovarter* (2008) 44 Cal.4th 983, 1004.)

### D. D.A.'s statements were admissible pursuant to an applicable hearsay exception or for a nonhearsay purpose.

The statements appellant challenges were part of conversations between D.A. and appellant that transpired through social media and text messages. Preliminarily, we observe that appellant's messages to D.A. were admissible pursuant to Evidence Code section 1220. Appellant does not suggest otherwise. Appellant's claim is thus limited to the admissibility of D.A.'s statements in those conversations.

19.

We agree with respondent that most of D.A.'s messages to appellant were admissible under the coconspirator exception to the hearsay rule. (Evid. Code, § 1223.) As we described above, the evidence established D.A. agreed to work for appellant as a prostitute. This constituted a conspiracy to solicit and commit acts of prostitution. While it is unclear precisely how the agreement was made, the existence of a conspiracy may be established through circumstantial evidence, and " ' "be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy." ' " (*People v. Herrera* (2000) 83 Cal.App.4th 46, 64.) Thus, any of D.A.'s statements to appellant in furtherance of the conspiracy, including her statements about arranging sex dates and earning money, were admissible under this exception.

Appellant contends the coconspirator hearsay exception was inapplicable because no conspiracy was alleged or charged in this case. Appellant is mistaken. "It is well established that the defendant need not be charged with conspiracy" for the exception to apply. (*People v. Ambrose* (1986) 183 Cal.App.3d 136, 139; see *Brown*, *supra*, 14 Cal.App.5th at p. 324.) The lack of conspiracy charges against appellant and D.A. was irrelevant to the admissibility of the challenged statements.

Appellant also argues that "a prostitute cannot be charged with conspiring with her pimp," and therefore the coconspirator hearsay exception was legally inapplicable. He relies on *People v. Bogan* which held that "prostitution, a misdemeanor, cannot be elevated to a felony merely by charging the act as a conspiracy by the prostitute and her pimp to commit prostitution." (*People v. Bogan* (2007) 152 Cal.App.4th 1070, 1075 (*Bogan*).) However, *Bogan* also clarified that prostitutes could still be treated as "uncharged coconspirators" in a conspiracy prosecution against their pimp. (*Ibid.*) Relying on *Bogan*, *Brown* held that human trafficking victims could be treated as uncharged coconspirators for purposes of the coconspirator hearsay exception, even though the victims were shielded from prosecution for any related conduct under the Californians Against Sexual Exploitation Act (Proposition 35). (*Brown*, *supra*, 14

20.

Cal.App.5th at p. 335.) Accordingly, whether D.A. was charged with a conspiracy, or even prosecutable for such a conspiracy, did not affect the applicability of the coconspirator hearsay exception.

Respondent concedes that the coconspirator hearsay exception did not apply to D.A.'s statements during the February 3, 2022, conversation where appellant recruited D.A. to work for him. We agree that these statements were made before the conspiracy was formed, and thus were not admissible under the coconspirator hearsay exception. (See *People v. Homick* (2012) 55 Cal.4th 816, 872.) However, D.A.'s statements were admissible for the non-hearsay purpose of providing context to appellant's statements, which were admissible. (*People v. Turner* (1994) 8 Cal.4th 137, 189 [hearsay statements admitted to give meaning to the defendant's statements admitted under Evid. Code, § 1220], abrogated on another ground by *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn. 5; *People v. Davis*, *supra*, 36 Cal.4th at p. 538 [hearsay statements admissible to give context to the defendant's statements].) Hylton-Reed explained this conversation was appellant's effort to recruit and groom D.A. D.A.'s message to appellant that she was looking to buy drugs was necessary context to show how appellant manipulated her. It explained why appellant told her he would supply her with free drugs if she worked for him as a prostitute. Therefore, the trial court did not abuse its discretion in admitting D.A.'s social media and text messages with appellant.

### E. Any presumed error was harmless.

Assuming the trial court should have excluded D.A.'s electronic statements, the error was harmless. Even without D.A.'s text and social media messages, the evidence conclusively established D.A. was working for appellant as a prostitute. Appellant was stopped twice while driving a car with D.A. as a passenger. In each instance, one of appellant's other human trafficking victims was also in the car. S.V., who was in the car during the first traffic stop, testified D.A. did sex dates for appellant. M.R.V., who was in

21.

the car during the second traffic stop, testified D.A. told her she worked as a prostitute to make money for appellant's cannabis business, and that appellant takes half of her earnings. Appellant also sent messages to S.V. complaining about D.A. being too tired to do sex dates and "messing up [the] program."

"[S]tate law error in admitting evidence is subject to the traditional *Watson*[3] test: The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error." (*People v. Partida*, *supra*, 37 Cal.4th at p. 439; see *People v. Homick*, *supra*, 55 Cal.4th at p. 872 [applying *Watson* where hearsay evidence was erroneously admitted under the coconspirator hearsay exception].) Appellant argues the alleged evidentiary error rendered his trial fundamentally unfair and is therefore subject to the more stringent "beyond a reasonable doubt" standard for federal constitutional error set forth in *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).

We conclude the presumed error was harmless under either standard. Given the overwhelming evidence that appellant was pimping D.A. independent of the challenged messages, the guilty verdict rendered in this trial on the pimping charge was surely unattributable to the purported error. (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279.)

## IV.   The Trial Court did not Abuse its Discretion in Admitting a Video of Appellant Having Sex with one of his Juvenile Victims.

The trial court admitted a video of appellant having sex with C.W. over appellant's objection pursuant to Evidence Code section 352. Appellant contends this was an abuse of discretion. We conclude no abuse of discretion occurred, because the video was highly probative, short in length, and not unduly inflammatory relative to the other evidence presented in this case.

---

**3**      *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*).

## A.     Background.

The People sought to admit a video found on appellant's cell phone of appellant having sex with C.W.  Defense counsel objected under Evidence Code section 352, arguing the video had limited probative value because it was not necessary to prove an element of any of the alleged offenses, and was highly prejudicial because it depicted appellant having sex with a juvenile.  The prosecutor responded the video was probative because it reflects Hylton-Reed's testimony regarding "the relationship of a boyfriend pimp" and a sex trafficker "teaching a trafficking victim how to do sex acts."  The prosecutor also noted that there are four videos of appellant having sex with C.W., but the People were only seeking to admit one video, which was only 20 to 30 seconds in length.

The trial court overruled the Evidence Code section 352 objection and admitted the video into evidence, which was played for the jury.  The court reasoned the probative value of the video was "very high," and while the prejudicial effect was also "high," it did not outweigh the probative value.  The court also observed that the jury was "in tune with what type of a case it was," because it had already heard evidence and seen photos of a similar nature.  Finally, the court commended the prosecution for only electing to proceed on one of the four videos, noting the proffered video was short and did not "belabor anything."

## B.     Standard of review.

Evidence Code section 352 allows a trial court to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

"The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.…  'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against

23.

the defendant as an individual and which has very little effect on the issues.  In applying section 352, "prejudicial" is not synonymous with "damaging." ' [Citation.]" (*People v. Karis* (1988) 46 Cal.3d 612, 638.)

"The weighing process under [Evidence Code] section 352 depends upon the trial court's consideration of the unique facts and issues of each case, rather than upon the mechanical application of automatic rules.  [Citations.]  We will not overturn or disturb a trial court's exercise of its discretion under [Evidence Code] section 352 in the absence of manifest abuse, upon a finding that its decision was palpably arbitrary, capricious and patently absurd." (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1314.)

**C.      The trial court did not abuse its discretion in overruling appellant's Evidence Code section 352 objection.**

We agree with the trial court's analysis that the probative value of the video was high.  Hylton-Reed testified extensively about how traffickers lure, manipulate, and control their victims through the "boyfriend pimp" tactic, and that having sex with victims is part of that grooming process.  The video reflected such a grooming process, and helped explain why C.W. remained loyal to appellant even though he subjected her to repeated commercial sex acts for his financial benefit.  C.W. testified she cares for appellant and considers him a good friend but denied having a sexual relationship with him.  The video was relevant to rebut that denial, and to demonstrate that appellant manipulated C.W. through romance and intimacy.

The video was also relevant to prove appellant's possession of child pornography charge (§ 311.11, subd. (a); count 7).  Appellant does not dispute that the video constitutes child pornography, but argues its admission was unnecessarily cumulative because the prosecution had already established appellant was in possession of topless photos of C.W., and photos of C.W. and S.V. in lingerie.  But appellant pled not guilty to the child pornography charge, which put the elements of the offense in issue.  (§ 1019; *People v. Rowland* (1992) 4 Cal.4th 238, 260.)  The existence of other incriminating

evidence did not relieve the People of their burden to prove the charge beyond a reasonable doubt. Moreover, the video of appellant engaged in sexual intercourse with a juvenile was far more persuasive and forceful than still photos of juveniles in various stages of undress. Presumably this is why the prosecutor argued during closing argument that the video was "the easiest way to find [appellant guilty of] possession of child pornography." Thus, the video was not merely duplicative, but constituted compelling evidence of appellant's guilt of a charged offense.

We recognize that a video of a defendant having sex with a juvenile is inherently inflammatory and carries some risk of unfair prejudice. However, the trial court and the People made efforts to limit the prejudicial effect by admitting only one video that was 20 or 30 seconds long. Additionally, as the court recognized, the jury had already seen lewd photographs of appellant's juvenile victims and heard extensive evidence that they were induced to engage in numerous commercial sex acts for appellant's financial benefit. Thus, the video of appellant having sex with C.W. was not uniquely inflammatory relative to the other evidence presented at trial.

The record demonstrates the trial court carefully reviewed the challenged video and ruled that it may be admitted based on a balancing of appropriate factors under Evidence Code section 352. The court reasonably found the video was highly relevant, and that its probative value was not substantially outweighed by the danger of undue prejudice. We therefore cannot conclude that this ruling was "arbitrary, capricious and patently absurd." (*People v. Jennings*, *supra*, 81 Cal.App.4th at p. 1314.) Accordingly, our review for an abuse of discretion reveals the trial court did not err, and this claim is without merit.

### D.     Any presumed error was harmless.

Even assuming the video was erroneously admitted, any presumed error was harmless. As with the previous claim, appellant contends admission of the video

rendered his trial fundamentally unfair, and therefore the error should be assessed under the federal constitutional standard of *Chapman*. Respondent counters that any error should be reviewed under *Watson*'s "reasonable probability" standard. (See *People v. Gonzales* (2011) 51 Cal.4th 894, 924 [Evid. Code, § 352 rulings are ordinarily reviewed under *Watson*].)

We conclude the trial court's ruling was harmless under either standard. As detailed above, the evidence at trial conclusively showed that appellant organized and orchestrated a human trafficking operation designed to exploit young women and juveniles by inducing them to engage in commercial sex acts for his benefit. C.W.'s, S.V.'s, and M.R.V.'s unrefuted testimony established appellant trafficked them. D.A.'s statements and text messages clearly demonstrated she was working for appellant as a prostitute. M.A.'s description of appellant's previous acts of trafficking was consistent with appellant's charged conduct. Appellant's social media and text messages, writings, and tattoos revealed the sole purpose of his operation was to compel young women to earn money for him through commercial sex acts. And when appellant was arrested and his residence was searched, he was found in possession of a firearm, large quantities of cannabis and cannabis products for sale, and child pornography. The evidence of guilt as to each count was overwhelming.

To the extent the video was prejudicial, the prejudice was mitigated by the fact that appellant's charges, and the evidence against him, was also inflammatory. As the trial court recognized, when the jury viewed the video, they had already heard evidence that appellant manipulated vulnerable young women into engaging in commercial sex acts. The jury had also seen lewd photographs of the victims and heard testimony that appellant had sex with C.W., a 15-year-old juvenile. The video was not uniquely or unduly inflammatory given the nature of the other evidence at trial.

Considering the clear evidence of guilt relative to the limited prejudicial effect of the admission of the video, we conclude beyond a reasonable doubt that the purported

error did not contribute to the verdict.  (See *Chapman*, *supra*, 386 U.S. at p. 24.)

Likewise, it is not reasonably probable that the verdicts would have been more favorable

to appellant absent this purported error.  (*Watson*, *supra*, 46 Cal.2d at p. 836.)  Any

presumed error was harmless.

**V.      The Trial Court did not err in Instructing the Jury in CALCRIM No. 1191B That it Could Draw a Propensity Inference From Currently Charged Offenses.**

The jury was instructed with CALCRIM No. 1191B, which stated, in pertinent

part:

> "If the People have proved beyond a reasonable doubt that [appellant] committed one or more of [the human trafficking of a minor offenses charged in counts 1-3], you may, but are not required to, conclude from that evidence that [appellant] was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that [appellant] was likely to commit and did commit the other sex offenses charged in this case."

Appellant contends this instruction violated his federal due process right to a fair trial,

arguing that allowing the jury to consider charged offenses as propensity evidence

undermined the People's burden of proof.

Appellant acknowledges our Supreme Court rejected this argument in *People v.*

*Villatoro* and upheld an instruction similar to CALCRIM No. 1191B.[4]  (*People v.*

*Villatoro* (2012) 54 Cal.4th 1152, 1167–1169 (*Villatoro*).  The Supreme Court reasoned

Evidence Code section 1108 allows a jury to draw a propensity inference from currently

charged offenses.  (*Villatoro*, *supra*, 54 Cal.4th at p. 1164.)  It concluded the challenged

instruction did not "impermissibly lower the standard of proof or otherwise interfere with

defendant's presumption of innocence," because the instruction clearly told the jury that a

---

**4**      CALCRIM No. 1191B was drafted in 2017, and did not exist when *People v. Villatoro* was decided.

charged offense cannot be used to draw an inference of propensity unless proven beyond a reasonable doubt. (*Id.* at p. 1168.)

As appellant concedes, we are bound to follow California Supreme Court precedent. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Appellant explains he raises the instant claim "to preserve his federal claim that allowing a jury to use charged offenses to infer that he committed the other offenses charged in the same case violated his Fourteenth Amendment due process right to a fundamentally fair trial."

*Villatoro* makes clear that CALCRIM No. 1191B does not conflict with due process or principles of fundamental fairness. (*Villatoro*, *supra*, 54 Cal.4th at p. 1168; see *People v. Meneses* (2019) 41 Cal.App.5th 63, 68 [finding *Villatoro* dispositive of defendant's due process challenge to CALCRIM No. 1191B].) We therefore conclude the trial court did not err in giving the instruction.

## DISPOSITION

The judgment is affirmed.

LEVY, Acting P. J.

WE CONCUR:

DETJEN, J.

DE SANTOS, J.